IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| PHOENIX BOND INDEMNITY CO., et al ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No.  05 CV 4095 |
| vs. ) | |
| ) | |
| JOHN BRIDGE, BARRETT ROCHMAN, et al ) | Chief Judge James F. Holderman |
| ) | |
| ) | Magistrate Maria Valdez |
| Defendants ) | |
| BCS SERVICES, INC. and PHOENIX BOND ) | |
| & INDEMNITY CO., ) | No. 07 C 1367 |
| ) | |
| Plaintiffs, ) | (Consolidated with 05 CV 4095 |
| v. ) | For discovery purposes) |
| ) | |
| HEARTWOOD 88, LLC, BAMP, LLC, ) | |
| ANTHONY DELAURENTIS, RICHARD ) | |
| TURER, RICHARONY, LLC, *et al.,* ) | |
| ) | |
| Defendants ) | |

**MOTION TO COMPEL**

COME JOHN BRIDGE, BARRETT ROCHMAN, SABRE GROUP, LLC, CCJ INVESTMENTS, LLC, BRB INVESTMENTS, LLC, CORRINE ROCHMAN, JESSE ROCHMAN, CHRISTOPHER ROCHMAN, SI BOO, LLC, CCPI, LLC, CMS SERVICES, LLC, AZTEK PARTNERS LLC, and CHONUS LLC  ("Defendants"), by their attorneys, Harold L. Moskowitz and Donald B. Levine, and pray that this court compel plaintiffs, PHOENIX BOND & INDEMNITY CO., and BCS SERVICES, INC. ("Plaintiffs"), to produce certain financial information previously requested and not produced.  In support hereof, Defendants state as follows:

In addition to having the herculean task of having to attempt to prove the false

1

allegations of the complaints, Plaintiffs also have to prove two critical elements which are a prerequisite in the prosecution of any RICO claim: proximate cause and the actual damages suffered by plaintiffs directly arising from the alleged RICO actions of the Defendants. These cases are based on the unsupported allegations of these Plaintiffs that: a) all of the 70 or so defendants in this and the related *Heartwood Case* (including the Defendants) lied to the Cook County Treasurer prior to the 2002-2007 Cook County tax sales; b) as a result of their statements to the Cook County Treasurer, the various defendants were violating the Single Simultaneous Bidder Rule ("SSBR") which would disqualify these Defendants from the sale and they would not entitled to obtain *even one* tax lien that they did in fact purchase; and c) one or both of the Plaintiffs bid on each and every tax lien auctioned at Cook County tax sales which was successfully purchased by these 70 defendants so that they are entitled to all or some unknown portion of those liens. As this Court is aware, Plaintiffs thus claim an interest in some or all of the approximate 19,000 tax lien certificates purchased by the various defendants in these cases during the Cook County tax auctions during the years 2002-2007. According to the Complaints, those certificates were purchased for (and Plaintiffs must show they had) at least $14.5 million in 2002, $29.8 million in 2003, $19.2 million in 2004, and $20.2 million in 2005 –in addition to what they paid for the tax certificates bought by the Plaintiffs themselves in these Cook County sales, what they paid for certificates bought in other tax auctions in other counties, and monies needed to post subsequent taxes on the certificates purchased.

However, since January, 2007 when a number of these Defendants served interrogatories upon the Plaintiffs seeking information regarding the alleged damages suffered by the Plaintiffs – a required element of any RICO claim – Plaintiffs have refused

2

to disclose to any Defendant their alleged damages.[1] Additionally, the Court may further be aware that in a hearing on Defendants' Objections pursuant to Fed. R.Civ. P. 72(a) to this Court's order dated June 30, 2009 granting motions to quash filed by Plaintiffs, the Plaintiffs admitted that their statement to this Court in November, 2008, that they had produced all of the loan documents to the Defendants was not true and that they had only submitted documents that they had submitted to the Cook County Treasurer (i.e., that letter of credit deposited each year with the Treasurer which merely limits the amount of liens able to be purchased on a single day and not for the entire sale or all sales) and which were the same documents referenced in their in September, 2008, Plaintiff Phoenix's answer to the Rochman Defendants' first request for documents related to the source of funding (See Exhibit 1 hereto).

It goes without saying that a critical element to disprove Plaintiffs' possible damage claims is whether each of the Plaintiffs had the financial capability to make such purchases. Obviously, that would mean that the Plaintiffs had the funding available at the time of the sale to buy the liens that they bid upon either as cash on hand or lines of credit given from a financial institution. At her deposition, Jocelyn Stoller a/k/a Jocelyn Congua, the sole shareholder of plaintiff BCS, testified that she somehow cannot remember what money she had available at *any* sale during the years 2002-2007. At the deposition of Andrew Marks, Phoenix's Vice-President, primary sale bidder, and 50% shareholder, he too was unable to describe the amount of credit available to Phoenix in most years (See Exhibit 2 attached

---

[1] Even though in November, 2005 Plaintiffs claimed in their Fed. R. Civ. P. 26(a)(1) filing to have suffered a minimum of $4 million in damages, which was increased to $10 million in a subsequent 26(a)(1) filing in 2007.

hereto, pp. 48-49). He stated that such information would be in the financial statements of Phoenix's (Exhibit 2, p. 55). Those audited financial statements were requested at that deposition.

As we are still unaware of the Plaintiffs' damages claim as well as the alleged theories behind them, Defendants maintain that a possible relevant issue may be the Plaintiffs' operations and their profit (or lack thereof) on the certificates they did buy. For example, BCS has seemingly suffered substantial losses for two of the years in question which Ms. Stoller has claimed to have resulted from the economy and buying liens at 0%.

Also at her deposition, Ms. Stoller admitted for the first time having been a 25% investor in an entity run by Carter & Reiter (Fair Deal of Illinois), which participated in the Cook County tax sales and that another entity run by Carter & Reiter (Von Steuben, Importers, Inc.) was lent money after the tax sale in 2005 by a bank she was a director and participated in the 2007 Cook County tax sale at the same time as BCS. However, she was unable to be specific as to the full details of these investments. Yet, at a deposition taken on October 20, 2009 of Joannie Fellows, BCS' accountant, Ms. Fellows testified that Ms. Stoller had investments in both, but she was also unable to describe the details. At her deposition and in a letter thereafter, Defendants asked BCS to produce certain tax returns, and specifically Ms. Stoller's Schedule E from her personal federal tax returns which would indicate any and all investments in other entities and her income/loss from BCS. See Exhibit 3.

Since that time, Plaintiffs have produced certain evidence consisting of certain LaSalle Bank reports as to portions of the BCS loans during 2002-2007, the 2002-2007 BCS U.S. Income Corporate tax returns, certain bank statements of both BCS and Phoenix

and alleged copies of the loan documents, and the audited financial statements of BCS covering the years 2003-2007.[2] Plaintiffs informed us that the person who had the most knowledge of BCS' credit lines was Ms. Fellows who resided in Tucson, Arizona. Not produced were the missing 2002 audited return, any financial statements of Phoenix, Ms. Stoller's Schedule E from her 2002-2007 returns, copies of checks and other evidence of her interest in either Fair Deal and/or Von Stueben.

However, at her recent deposition, Ms Fellows testified that the LaSalle reports only dealt with a portion of the loans (as the loan was split between the principal revolving line of credit and various LIBOR portions). After returning from said deposition, Defendants counsel conferred with Mr. Moynihan on October 22, 2009 asking for the remaining LaSalle reports, any checks, etc. showing any loans/investments in either Fair Deal and/or Von Stueben, the Schedule E's, and Phoenix's audited financial statements. Moynihan requested the request in writing which was sent on October 26, 2009 and responded to the next day. A copy of the request and response is attached hereto as Exhibit 4. Specifically, Plaintiffs refuse to produce: Ms. Stoller's Schedules C and E for the years in question; their tax returns for the years' 2008-2009; the BCS audited 2002 report (which compares that year to 2001); and the salary information for BCS for the years in question.

The Court should compel them to produce the information requested for the following reasons:

1.  *Stoller Schedules.* On individual tax returns, Schedule C reflects information

---

[2]The audited statements come in the nature of a sort of comparison with the year-end audit comparing the information with the prior year's condition. So that the audit is generally titled "Audited Financial Statement for the Year Ending December 31, 2004 and December 31, 2003."

      regarding sole proprietorships and Schedule E reflects profit and loss from investments in partnerships, Subchapter S corporations, LLC's and LLP's. Stoller has admitted to have an interest in two entities run by Carter & Reiter who participated in the tax sales at some of the same times as BCS. Defendants do not know – and Plaintiffs have failed to produce – *any* information regarding those investments. Depending on how her accountant detailed the information, Schedule E (and maybe even Schedule C) would show the investment as well as the result of the investment. If confirmed, the information would vitiate any BCS claim under both RICO and tortious interference for the years in which BCS and the entity both participated at the sale (which would be a violation of the Single Simultaneous Bidder Rule and would bar BCS – according to Plaintiffs' complaints – from any participation in those sales and any "loss of opportunity" claim). Thus, the documents are very relevant.

2. *Subsequent Tax Returns.* Because of the economy and real estate market, many tax buyers have suffered large losses on certificates due to carrying costs, etc. of properties no one either wants to or can afford to buy. This affects 2006-2007 tax certificate purchases and can be used to evaluate any damage claim amount and theory if they are ever produced.

3. *Salary Figures.* Since salary reduces profit, and the accountant was unsure who paid the main employees and in what amounts in the years in question, that information would be necessary to rebut any future salary claim.

4. *The Checks.* In addition to the rationale stated above as to the tax schedules

which is also applicable here, Carter & Reiter had this Court quash a subpoena directed to them on the grounds that they were merely BCS's counsel. Ms. Stoller admitted in her deposition that she paid for the presentation and prosecution of that motion, ostensibly on another party's behalf. Now we have evidence to show a secret partnership between her and Carter & Reiter to buy tax certificates at Cook County sales. We are entitled to obtain any and all documents proving said partnership and how that would affect any claim for the years where BCS and the Carter & Reiter entities were both bidding for liens.[3]

5. *The 2002/2001 Audit.* While Plaintiffs may think we have the 2002 information, we do not as the first financial statement received covered the 2004/2003 period.

Each and every one of these documents are necessary for Defendants' defense. The fact that these documents may be damning to Plaintiffs is not a valid reason to justify their refusal to produce the same. Since for purposes of discovery, relevancy will be construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, *any issue that is or may be in the case* (emphasis added)." *(Chavez v. DaimlerChrysler Corp.,* 206 F.R.D. 615, 619 [S.D.Ind.2002]; *Link v. Taylor* 2009 WL 127660, 1 [N.D.Ind.,2009], these documents are relevant and must be produced.

　　　　　　　　　　　　Respectfully submitted,

---

[3] What effect that will have on the Court reconsidering its previous order is a mattter for another day.

JOHN BRIDGE, BARRET ROCHMAN, SABRE GROUP, LLC, CCJ INVESTMENTS, LLC, CORRINE ROCHMAN, JESSE ROCHMAN, CHRISTOPHER ROCHMAN, SI BOO, LLC, CCPI, LLC, CMS SERVICES, LLC, AZTEK PARTNERS LLC, and CHONUS LLC

By: ___/s/Harold Moskowitz_____
      One of their Attorneys

HAROLD L. MOSKOWITZ
55 West Monroe Street, Suite 1100
Chicago, Illinois 60603
(312) 977-0223
ARDC: 3128347

DONALD LEVINE
LATIMER LEVAY & JURASIK, LLC
55 West Monroe Street, Suite 1100
Chicago, Illinois 60603
(312) 422-8000
ARDC: 1637355