IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PHOENIX BOND & INDEMNITY CO, et al., )
                                      )
                Plaintiffs,           )
                                      )
        v.                            )        No. 05 C 4095
                                      )
JOHN BRIDGE, et al.,                  )
                                      )
                Defendants.           )
_____)
BCS SERVICES, INC., et al.,           )
                                      )
                Plaintiffs,           )
                                      )        Consolidated with
        v.                            )        No. 07 C 1367
                                      )
HEARTWOOD 88, LLC, et al.,            )
                                      )
                Defendants.           )

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

        In these two consolidated cases, Plaintiffs Phoenix Bond & Indemnity Co. ("Phoenix")

and BCS Services, Inc. ("BCS") (collectively "Plaintiffs") have sued various Cook County tax

lien purchasers asserting claims under the Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. § 1961 et seq., and claims for tortious interference with prospective

business advantage under Illinois law.  These claims are based on the purchasers' alleged

conspiracies to violate the Cook County Treasurer's Single Simultaneous Bidder Rule during

various Cook County tax lien sales.  The SI Defendants,[1] Wheeler Defendants,[2] Michael Deluca

_____

[1]  "SI Defendants" refers to Jesse Rochman, John Bridge, Barrett Rochman, CCJ Investments,
LLC, Corinne Rochman, BRB Investments, LLC, Christopher Rochman, and Sabre Group, LLC,

and Gary Branse, Heartwood 88, LLC and BankAtlantic, the BG Defendants,[3] the Sass

Defendants,[4] and the Salta Defendants[5] (collectively "Defendants") each moved for summary

judgment on Plaintiffs' RICO and tortious interference claims (Case No. 05 C 4095, Dkt. No.

620; Case No. 07 C 1367, Dkt. Nos. 708, 713, 716, 722, 723, and 725).[6] On August 24, 2010,

this court issued minute orders in both *Phoenix Bond & Indemnity Co. v. Bridge*, Case No. 05 C

4095, and the consolidated case, *BCS Services, Inc. v. Heartwood 88, LLC*, Case No. 07 C1367,

granting Defendants' motions for summary judgment. (Case No. 05 C 4095, Dkt. No. 657; Case

No. 07 C 1367, Dkt. No. 816.) The reasons for those orders are explained below.

BACKGROUND

I.      Cook County Treasurer's Annual Tax Lien Sales

        Every year the Cook County Treasurer's Office sells tax liens at an auction on properties

---

who are defendants in Case No. 05 C 4095, together with defendants in Case No. 07 C 1367, SI
Securities, LLC, SI Boo, LLC, CMS Services, LLC, SI Securities Management, Inc., CCPI,
LLC, Kenneth Rochman, and Kevin Sierzega.

[2] "Wheeler Defendants" refers to Wheeler-Dealer, Ltd. and Timothy E. Gray.

[3] "BG Defendants" refers to Midwest Real Estate Investment Co., Midwest Real Estate
Investment Co. Employee Profit-Sharing Plan and Trust, David R. Gray (now deceased), Bonnie
J. Gray, Atlantic Municipal Corporation, and BG Investments, Inc.

[4] "Sass Defendants" refers to Kirk Allison, MD Sass Investors Services, Inc., MD Sass
Municipal Finance Partners-IV, LLC, MD Sass Municipal Finance Partners-V, LLC, MD Sass
Tax Lien Management, LLC, Sass Muni-IV, LLC, Vinaya Jessani, and Sass Muni-V, LLC.

[5] "Salta Defendants" refers to HBZ, Inc., Joshua Atlas, Lori Levinson, Judith Berger, Arlene
Atlas, Salta Group, Inc., and Marshall Atlas.

[6] Defendants Jeffrey Bridge, Jason Baumbach, Francis Alexander, Georgetown Investors, LLC,
Regal One, LLC, Optimum Financial, Inc., and Carpus Investments, LLC filed a motion to adopt
these other Defendants' motions for summary judgment (Case No. 05 C 4095, Dkt. No. 625),
which this court granted (Case No. 05 C 4095, Dkt. No. 629).

for which the owner, after having been given due notice, has failed to pay real estate taxes. During the auction, potential purchasers bid a percentage penalty which the delinquent owner must pay, in addition to the taxes and interest owed, to the winning purchaser to clear the lien. The winning bidder pays the County the delinquent taxes on the property and then owns the tax lien; it has the opportunity to obtain the tax deed, and thus own the property, if the delinquent owner does not pay the penalty, taxes, and interests within the statutory redemption period. (Case No. 07 C 1367, Dkt. No. 748 ("Pls.' Local R. 56.1(b)(3) Resp. Heartwood") ¶¶ 5-7.)

The penalty percentage that the potential purchasers may bid is capped at a maximum of 18% by statute and a minimum of 0% by County regulation. The winning bids are those at the lowest penalty rate. For liens awarded at the 0% rate, the purchaser of the lien would not make a profit on the penalty percentage of past-due taxes, but could make a profit from the 12% penalty which accrues on subsequent taxes or from enforcement of the lien if the owner fails to redeem the property. (*Id.* ¶¶ 8, 10, 12.)

Under usual procedures, once there is a winning bidder on a property, the winning bidder must provide notice to the owner of the property in accordance with Illinois law to complete the sale of the tax lien or to later petition for a deed to the property. Within four months and fifteen days of the purchase of the lien, buyers provide notice pursuant to 35 Ill. Comp. Stat. 200/22-5 ("22-5 notice") to the County that the County then mails to the owner. The buyer pays for the mailings to the owner. In addition, if the owner were not to redeem the property within the statutory period and the buyer wishes to petition for a deed, the buyer must file a petition five months before the end of the redemption period and provide notice of the petition pursuant to 35 Ill. Comp. Stat. 200/22-10 ("22-10 notice") to the owners, occupants, or other interested parties

to the property.  The County sheriff serves the 22-10 notice of the deed petition on the owners,

occupants, or interested parties.  Certified mail is used to send 22-10 notices to parties residing

outside the state.[7]

Before the tax lien sale held in 2001, the Cook County Treasurer's Office instituted the

Single, Simultaneous Bidder Rule ("SSBR").  (*See, e.g.,* Case No. 05 C 4095, Dkt. No. 636 ("SI

Defs.' Resp. to Pls.' Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts") ¶ 39.)  The SSBR prevents

related entities from bidding at the same time at the auctions:

> One tax buying entity (principal) may not have its/his/her/their actual or apparent
> agents, employees, or related entities, directly or indirectly register under multiple
> registrations for the <u>intended or perceived</u> purpose of having more than one
> person bidding at the tax sale at the same time for the <u>intended or perceived</u>
> purpose of increasing the principal's likelihood of obtaining a successful bid on a
> parcel.
>
> This rule does not prevent a single bidder from alternating the identity of the
> buyer for whom they are bidding at any given time, <u>so long as related bidding
> entities, or entities perceived to be related</u>, are not bidding at the same time.

(Case No. 07 C 1367, Dkt. No. 751, Pls.' Com. App. 37 at CCT00029 (emphasis in original).)[8]

A "Related Bidding Entity" is "any individual, corporation, partnership, joint ventures,

---

[7]  Although not specifically addressed in the parties' papers, these facts regarding the steps the
winning bidder takes after winning a lien were previously alleged in Plaintiffs' complaints (*see*
Case No. 07 C 1367, Dkt. No. 525, 3d Am. Compl. ¶¶ 63-65), and have not been challenged by
Defendants on summary judgment.

[8]  The quoted language appears in the Cook County Treasurer's "Registration Materials & Rules
and Regulations" for the tax lien sale occurring in 2003.  (*See* Pls.' Com. App. 37 at CCT00029.)
Heartwood 88 LLC and BankAtlantic dispute that the SSBR in effect in 2001 was the same
SSBR in effect for all tax lien sales at issue in this case.  (Case No. 07 C 1367, Dkt. No. 766
("Heartwood Defs.' Resp. to Pls.' Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts") ¶ 39.)  Those
Defendants, however, have not explained how the SSBR may have differed during other tax
liens sales.  For purposes of Defendants' current motions, the court assumes that the SSBR, as
articulated in 2003, applied for all the tax lien sales at issue.

limited liability companies, business organizations, or other entities that have a shareholder, partner, principal, officer, general partner or other person or entity having an ownership interest in common with, or contractual relationship with, any other registrant in the . . . Annual Tax Sale." (*Id.*) All bidders must register with the Treasurer to participate in the auction and, at that time, the bidders must affirm under penalty of perjury compliance with the SSBR. (*Id.* at CCT00015, CCT00029.)

## II. Plaintiffs' Claims Against Defendants

In Case No. 05 C 4095 and consolidated Case No. 07 C 1367, Plaintiffs filed complaints against Defendants, claiming substantive RICO and RICO conspiracy violations with mail fraud as the predicate act against Defendants in addition to asserting claims for tortious interference with prospective business advantage under Illinois law. Specifically, Plaintiffs allege that for the tax lien sales occurring in years 2002 through 2007 various combinations of Defendants formed three different "rigged bidding enterprises" to act together as related bidders and bid on the same properties at the lowest penalty rate in order to increase their share of allotted properties. Those enterprises, according to Plaintiffs, schemed to defraud both the Treasurer and competing buyers of tax liens by falsely representing that they were non-related bidders and falsely affirming to follow the SSBR. Each enterprise's scheme was alleged to be executed through the use of the mail, in that the successful bidders caused to be sent the 22-5 and 22-10 forms to the delinquent owners in order to complete the sale of the tax lien or to petition for a deed to the property. Defendants have moved for summary judgment on these claims.

<u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this assessment, "[a]ll facts and reasonable inferences are to be construed in favor of the nonmoving party," but "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008) (quoting *South v. Ill. EPA*, 495 F.3d 747, 751 (7th Cir. 2007), and *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)).

"[W]hen confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original). "To put it somewhat less delicately, summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Walsh v. Long Term Disability Coverage*, 601 F. Supp. 2d 1035, 1046 (N.D. Ill. 2009) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)).

<u>ANALYSIS</u>

I.     Defendants' Motions for Summary Judgment on Plaintiffs' RICO Claims

The RICO statute provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Section 1962, which contains RICO's criminal provisions, makes it "unlawful for any person

employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." § 1962(c). "Racketeering activity," as defined by the statute, covers a number of predicate acts including mail fraud. § 1961. Additionally, under §1962(d), "[i]t [is] unlawful for any person to conspire to violate any of the provisions of [§1962]."

Defendants have moved for summary judgment on Plaintiffs' RICO claims, arguing that Plaintiffs cannot prove that Defendants' alleged violations of the Cook County Treasurer's SSBR proximately caused Plaintiffs' injuries. Specifically, Defendants contend that a number of independent and unaccountable variables prevent Plaintiffs from proving proximate cause, including (1) Plaintiffs cannot establish that the tax liens were awarded pursuant to the "equal allocation" system previously alleged by Plaintiffs; (2) Plaintiffs have no evidence of what remedy the Cook County Treasurer, Maria Pappas, would have imposed for violations of the SSBR (e.g., whether a defendant would have been barred from only one sale, permanently barred, or barred at all);(3) Plaintiffs cannot identify the specific liens they bid on at the 0% penalty rate and lost to a Defendant violating the SSBR; (4) Plaintiffs lack any evidence of how third-party bidders were bidding at the auctions; and (5) Plaintiffs cannot prove that the liens Plaintiffs would have won if Defendants had not allegedly violated the SSBR would have been more profitable than the liens Plaintiffs actually won.

Plaintiffs insist that such evidence is unnecessary to establish proximate cause. Rather, according to Plaintiffs, proximate cause in this case is "simple and straightforward": "Defendants improperly participated in the sales, obtained liens that–as ineligible bidders–they

should not have obtained, and injured the eligible bidders, including Plaintiffs, by reducing the number of liens they obtained."  (Case No. 07 C 1367, Dkt. No. 746 ("Pls.' Opp.") at 1-2.) Thus, in Plaintiffs' opinion, they need not prove "just how many liens Plaintiffs would have received" because that issue "is a damages question not raised by Defendants' motions."  (*Id.* at 20-21.)  The court, however, is not persuaded that, in the RICO context, simply establishing a logical connection between Plaintiffs' harm and Defendants' accused actions necessarily proves that Defendants' actions proximately caused Plaintiffs' injuries.  To the contrary, despite Plaintiffs' attempts to wholly separate their proof of proximate cause from their ability to prove damages, based on this court's review of the relevant precedent, the two inquiries are not mutually exclusive but necessarily involve overlapping and related considerations.

In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), the Supreme Court held that to prevail on a RICO claim a plaintiff must show not only that the defendant's violation was a "but for" cause of the alleged injury but also that it was the proximate cause.  *Id.* at 268.  According to the Court, requiring a direct relationship between the plaintiff's injuries and the defendant's accused actions serves at least three purposes, including preventing a plaintiff from receiving damages unrelated to the defendant's violations that injured the plaintiff:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors.  Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries.  And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Id.* at 269-70 (internal citations omitted).

Applying *Holmes*, the Supreme Court in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006),rejected the plaintiff's proximate causation theory for its RICO claim, which was based on its competitors' purported "practice of failing to charge the requisite New York sales tax to cash-paying customers, even when conducting transactions that were not exempt from sales tax under state law." *Id.* at 454. According to the plaintiff, these practices "allowed [the defendant] to reduce its prices without affecting its profit margin," causing plaintiff to lose sales. *Id.* at 454, 458. The Court determined that the connection between the defendants' accused practices and the plaintiff's injuries was too "attenuated" and would result in "speculative . . . proceedings":

> A court considering the claim would need to begin by calculating the portion of [the defendant's] price drop attributable to the alleged pattern of racketeering activity. It next would have to calculate the portion of [the plaintiff's] lost sales attributable to the relevant part of the price drop. *The element of proximate causation recognized in* Holmes *is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation.*

*Id.* at 459-60 (emphasis added); *see also Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2142 (2007) ("The direct-relation requirement avoids the difficulties associated with attempting 'to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors . . . .'" (quoting *Holmes*, 503 U.S. at 269)). Alleging that the defendant "sought to gain a commercial advantage over [the plaintiff]" did not suffice to establish proximate cause. *Anza*, 547 U.S. at 460. To the contrary, the Court expressly recognized that "[a] RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense." *Id.* Also significant, the Court recognized that not all three considerations justifying the direct-relationship requirement outlined in *Holmes* need be present to support a determination that the

plaintiff failed to allege proximate cause. *Id.* (finding plaintiff failed to allege proximate cause "[n]otwithstanding the lack of any appreciable risk of duplicative recoveries, which is another consideration relevant to the proximate-cause inquiry").

More recently in *Hemi Group, L.L.C. v. City of New York*, 130 S. Ct. 983 (2010), the Court emphasized that the defendant's intent to harm the plaintiff and the foreseeability of that harm were insufficient to satisfy RICO's proximate causation requirements. Criticizing the dissent's position which "would find that the City has satisfied [the proximate cause] requirement because 'the harm is foreseeable; it is a consequence that [the defendant] intended, indeed desired; and it falls well within the set of risks that Congress sought to prevent,'" *id.* at 991, the majority explained that this theory of causation previously was rejected in *Anza*: "Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm. Indeed, *Anza* and *Holmes* never even mention the concept of foreseeability," *id.* Based on *Hemi*, this court agrees with Defendants that Plaintiffs' theory of proximate causation, which glosses over the specific facts and evidence in this case and instead focuses more generally on Defendants' intent and the foreseeability that their presence in the auctions would have injured Plaintiffs, has been rejected by the Supreme Court.

Case law applying RICO's proximate causation requirement in the bidding context is also instructive. In *James Cape & Sons Co. v. PCC Construction Co.*, 453 F.3d 396 (7th Cir. 2006), for example, the plaintiff brought RICO claims against the defendants based on their "collaborating to rig bids for construction projects for . . . the State of Wisconsin Department of

Transportation." *Id.* at 398.[9] According to the plaintiff, the defendants' collusion to underbid the plaintiff resulted in the plaintiff being "awarded fewer contracts than it otherwise would have been." *Id.* at 399. The Seventh Circuit determined that the plaintiff failed to allege that the RICO violation was the proximate cause of its damages. Relying on *Anza*, the court explained that the plaintiff's theory of causation was too speculative: "A court could never be certain whether Cape would have won any of the contracts that were the subject of the conspiracy 'for any number of reasons unconnected to the asserted pattern of fraud.'" *Id.* at 403 (quoting *Anza*, 547 U.S. at 458). The court additionally recognized that "[i]t is entirely possible that Defendants would have won some bids absent the bid-rigging scheme, even if making less profits in the meantime. Furthermore, Cape cannot show what portion of its 'lost market share' is attributable to the bids lost to the bid-rigging scheme." *Id.* at 403. *See also Kaye v. D'Amato*, 357 Fed. Appx. 706, 716 (7th Cir. 2009) (dismissing plaintiff's RICO claim where plaintiff could not "demonstrate that the city would have sold him the . . . property had they not decided to sell it to [defendant]").

Based on this legal authority, and after reviewing the evidence and viewing it in the light most favorable to Plaintiffs, the court agrees with Defendants that Plaintiffs are unable to prove that Defendants' alleged violations of the SSBR proximately caused Plaintiffs' injuries.

A.    Allocation of Liens at the Cook County Tax Lien Sales

---

[9] The court notes that it previously distinguished *James Cape* from this case based on Plaintiffs' original descriptions of how the auctioneers awarded liens at the Cook County tax lien sales. (Case No. 07 C 1367, Dkt. No. 137, Mem. Op. & Order 14.) As discussed below, however, those descriptions have been proven to be inaccurate. Based on how these sales actually operated, as demonstrated by the evidence, even when viewed in the light most favorable to Plaintiffs, this court believes that *James Cape*'s elucidation of the proximate cause requirement in the civil RICO context is relevant to Plaintiffs' claims in this case.

During the pleading stage of this litigation, Plaintiffs repeatedly described the Cook County tax lien sales as "ensur[ing] that there is an equal apportionment of liens among the lowest bidding tax buyers." (*See* Case No. 07 C 1367, Dkt. No. 139, Corrected 1st Am. Compl. ¶ 28; Dkt. No. 387, 2d Am. Compl. ¶ 61; Dkt. No. 525, 3d Am. Compl. ¶ 61.) Based on Plaintiffs' description of the tax lien sales, this court, the Seventh Circuit and the Supreme Court determined that Plaintiffs had alleged a sufficiently direct relationship between their injuries and Defendants' purported violations of the SSBR to survive Defendants' motions to dismiss.

For example, relying on Plaintiffs' descriptions of the County tax lien sales, the Seventh Circuit summarized the allocation of liens as follows: "If X bids 0% on ten parcels, and each parcel attracts five bids at that penalty rate, then the County awards X two of the ten parcels. Winners share according to the ratio of their bids to other identical bids." *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 929 (7th Cir. 2007); *see also Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2135 (2008) ("The county's solution is to allocate parcels 'on a rotational basis' in order to ensure that liens are apportioned fairly among 0% bidders.").

This court also denied certain Defendants' motions to dismiss based on Plaintiffs' allegations regarding the lien allocations: "Here, it is plausible that Plaintiffs can prove at an appropriate time in this litigation that the Cook County Treasurer's Office employs a system of allocation that guarantees equal distribution of properties where multiple parties bid the lowest penalty." (Case No. 07 C 1367, Dkt. No. 556 at 2.) As this court further recognized, however, "[i]f Plaintiffs cannot prove their theory of allocation at the appropriate time, then their claim must fail." *Id.*

Based on the evidence in the record before the court, after the completion of discovery,

Plaintiffs' prior descriptions of the Cook County tax lien sales were inaccurate in that Plaintiffs' prior descriptions injected a level of mathematical precision into the auctions that never factually existed. Indeed, rather than employing a system that "guarantees equal distribution of properties," Plaintiffs do not dispute that the County instead instructed auctioneers to award liens to the first bidder to bid 0%. (Pls.' Local R. 56.1(b)(3) Resp. Heartwood ¶ 34.) If the auctioneers were unable to determine who the first bidder was, they were instructed to "choose one buyer at random, but be sure to spread the choices fairly so as not to favor any one buyer." (*Id.* ¶ 39.) Neither the first bidder system nor the random "fair" allocation of liens, however, ensures bidders the type of pro rata bid allocation previously described by Plaintiffs.

Apparently recognizing that this "first bidder" system necessarily undermines their original causation theory, Plaintiffs emphasize that the "auctioneers were confronted countless times a day with multiple bidders simultaneously bidding 0% on liens" (Pls.' Opp. 29), where the auctioneers were unable to identify the first bidder and under those circumstances were forced to resort to the "fair" method of allocation (Pls.' Local R. 56.1(b)(3) Resp. Heartwood ¶ 34).

Regardless of whether some liens were awarded pursuant to the "fair" system, however, Plaintiffs do not dispute that several auctioneers recalled that they awarded liens in situations "where there were multiple bidders at 0% only by doing the best they could to pick the first winning lowest bid." (Case No. 07 C 1367, Dkt. No. 749 ("Pls.' Local R. 56.1(b)(3) Resp. Sass") ¶ 14.) Thus, viewing the evidence in the light most favorable to Plaintiffs, at least some portion of the purchased liens were not awarded under the "fair" system but randomly to the person the auctioneer subjectively perceived to be the first bidder. Because neither the County nor the parties have any records distinguishing between liens purchased at the 0% penalty rate

where the auctioneers believed they awarded the liens to the first bidder and those where the

auctioneers attempted to randomly distribute the liens "fairly" (*id.* ¶ 20), and Plaintiffs have not

identified any auctioneer testimony on that subject, Plaintiffs have no evidence from which a

jury could reasonably identify the specific liens that were awarded pursuant to the "fair"

system.[10]    Furthermore, even assuming that Plaintiffs could identify which liens were

awarded under the "fair" system, that system of lien allocation does not guarantee that

"[w]inners share according to the ratio of their bids to other identical bids," *Phoenix Bond*, 477

F.3d at 929, thus complicating the causal link between Defendants' alleged SSBR violations and

Plaintiffs' injuries.  Plaintiffs do not dispute that the number of bidders varied not only from

day-to-day but also over the course of each auction day.  (Pls.' Local R. 56.1(b)(3) Resp. Sass ¶

46.)  They also concede that there are no records of the number of actual bidders on a particular

lien.  (*Id.* ¶ 54.)

Moreover, each tax lien sale involved approximately eleven to thirteen auctioneers who

changed shifts every one and a half to two hours.  (*Id.* ¶ 9.)  During the shift change, the

outgoing auctioneer did not discuss with the incoming auctioneer which liens particular buyers

had been bidding on or were awarded.  (*Id.*)  Nor was the incoming auctioneer provided with a

listing of such information.  (*Id.*)  The court, therefore, agrees with Defendants that the "fair"

---

[10]  Plaintiffs also extensively rely on testimony from certain Cook County Treasurer employees
who were not auctioneers and Plaintiffs' own bidders describing how they observed the
auctioneers' ability to award liens to the first bidder.  The court agrees with Defendants that this
testimony is speculative and lacks foundation as to whether the auctioneer could identify the first
bidder.  The parties do not dispute that the auctioneers had the final decision as to who was
awarded the liens. (Pls.' Local R. 56.1(b)(3) Resp. Sass ¶ 13.)  Because only the auctioneers
would know if they awarded liens to the person they perceived was the first bidder, someone
else's subjective belief as to whether the auctioneer was able to award a lien to the first bidder is
speculative and lacks the requisite personal knowledge as required by Federal Rule of Evidence
602.

allocation system, like the first bidder system, "was a subjective, contingent, discretionary method of awarding liens that depended on the conduct of other parties." (Dkt. No. 760 ("Sass Defs.' Reply") at 14-15.)

Thus, although the court assumes for purposes of this motion that the auctioneers did attempt to "spread the choices fairly so as not to favor any one buyer" when they could not identify the first bidder (Pls.' Local R. 56.1(b)(3) Resp. Heartwood ¶ 39), the undisputed evidence demonstrates that the auction system was not designed to ensure an equal allocation of liens. Without this equal allocation, assessing the impact Defendants' alleged violation of the SSBR had on the value of Plaintiffs' lien portfolios necessarily implicates the "type[] of intricate, uncertain inquiries" that the Supreme Court has cautioned against allowing to "overrun[] RICO litigation." *Anza*, 547 U.S. at 460.

B.      Evidence of the Consequences for Violating the SSBR

Furthermore, Plaintiffs' RICO claims also are based on the fundamental assumption that Defendants should not have been bidding at the Cook County tax lien sales. Indeed, as the Supreme Court noted in *Bridge*, "if the county knew petitioners' attestations were false but nonetheless permitted them to participate in the auction, then arguably the county's actions would constitute an intervening cause breaking the chain of causation between petitioners' misrepresentations and respondents' injury." *Bridge*, 128 S. Ct. at 2144. Plaintiffs, however, have not presented any admissible evidence regarding what, if any, action the Cook County Treasurer would have taken against Defendants who were violating the SSBR. Instead, based on the record before the court, a jury would be forced to speculate as to whether Defendants violating the SSBR would have been permanently barred from the County tax lien sales, excluded for only a day or a year, or faced some other unknown consequence.

Plaintiffs rely on affidavits from three former Chief Legal Counsels for the Cook County Treasurer, Judge Martha Mills,[11] Vasiliki Pappas, and Susan Kortokrax, as evidence that violators of the SSBR would have been barred from the County tax lien sales. (Pls.' Com. App. 6, 8, 10.) The court disagrees that these former Chief Legal Counsels would be able to testify at trial as to the likely consequences for violating the SSBR. During their depositions, both Judge Mills and Vasiliki Pappas testified that Maria Pappas, the Cook County Treasurer, would have made the final decision on what steps to take in response to a SSBR violation. (Case No. 07 C 1367, Dkt. No. 727, Defs.' Joint Ex. 8, Mills Dep. 54:11-55:3 ("The final word [with regard to what happened to someone who violated the SSBR] would have been Maria Pappas. The final word in that office on anything was Maria Pappas."); Defs.' Joint Ex. 14, V. Pappas Dep. 75:5-15 ("The final say on any action in the Treasurer's Office was the Treasurer.").) This testimony is uncontradicted. Judge Mills also reiterates this understanding in her affidavit: "The final decisions with respect to such prospective bidder's participation at the sales would rest with the Cook County Treasurer, at those times Maria Pappas." (Pls.' Com. App. 6, Mills Aff. ¶ 4.) Maria Pappas, however, was never deposed in this case.

Consequently, although the court appreciates Judge Mills's statement in her affidavit that she would "have no doubt that in those circumstances such prospective bidders would be barred from participating in the Tax Sales" (Mills Aff. ¶ 4), the court agrees with Defendants that Judge Mills's belief as to what the Treasurer would have done is mere conjecture and inadmissible speculation. *See* Fed. R. Civ. P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant

---

[11] Judge Mills currently is a judge in the Circuit Court of Cook County, Illinois. (Pls.' Com. App. 6, Mills Aff. ¶ 1.)

is competent to testify on the matters stated."); *see also Chiaramonte v. Fashion Bed Group*, 129 F.3d 391, 397 (7th Cir. 1997) (recognizing in the discrimination context that "[s]tatements by a non-decision-maker that amount to mere speculation as to the thoughts of the decision-maker are irrelevant"). The affidavits from Vasiliki Pappas and Susan Kortokrax, in which they state that if submitted registration materials were discovered to be "materially false or inaccurate, then the related buyer/bidder would have failed to satisfy the requirements for participation" (Pls.' Com. App. 10, Vasiliki Pappas Aff. ¶ 5; Pls.' Com. App. 8, Kortokrax Aff. ¶ 5), similarly are not evidence that the Treasurer actually would have barred Defendants from participating in the tax lien sales. Nor can the court draw a reasonable inference that Defendants would have been barred based on speculation or conjecture. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) ("[O]ur favor toward the nonmoving party does not extend to drawing '[i]nferences that are supported by only speculation or conjecture.'" (citing *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008))).

Furthermore, assuming that the Treasurer would have taken some action against Defendants, Plaintiffs have no evidence of what that action would have been. Plaintiffs notably do not dispute that "[e]ven if a violation of the Treasurer's rules was discovered, there could have been a myriad of potential punishments imposed by the Treasurer, from simply requiring that the violation be rectified, to a ban of a day or a session, to even a ban of just the year in question." (Case No. 05 C 4095, Dkt. No. 633 ("Pls.' Local R. 56.1(b)(3) Resp. SI") ¶ 69.) Whether the Treasurer would have permitted various Defendants to participate in certain tax lien sales, however, could impact Plaintiffs' claim to liens purchased by those Defendants. For example, if certain Defendants would have been barred from the 2003 tax lien sales but allowed to participate in the following years, Plaintiffs would not be entitled to liens purchased by those

Defendants at the later sales. As a result, this court believes that requiring a jury to predict, without any evidence, just how long a defendant would have been barred from the tax lien sales, if barred at all, adds yet another layer of complexity and speculation to the proximate causation analysis.

      C.     Evidence of Plaintiffs' 0% Bids

In their Opposition to Defendants' motions, Plaintiffs also have not presented to the court any evidence of the liens they purportedly bid the 0% penalty rate at the County auctions. In this court's August 10, 2007 order denying certain Defendants' motions to dismiss, the court recognized that Plaintiffs' complaint "still failed to list with particularity the properties on which they also bid the minimum percentage penalty." (Case No. 07 C 1367, Dkt. No. 137, Mem. Op. & Order 20.) The court offered Plaintiffs an opportunity to amend their complaint to "identify the specific properties on which the defendants and the plaintiffs bid and whichever defendant won." (*Id.*)

Initially, both Phoenix and BCS produced lists in response to interrogatory requests which purported to be lists of their *actual* bids at the 0% penalty rate for the tax lien sales at issue. (Pls.' Local R. 56.1(b)(3) Resp. Heartwood ¶ 44.) These lists apparently were based on Plaintiffs' bid sheets, which contained the lists of the property liens for sale at the auction and Plaintiffs' notes about the properties. (*See* Meyers Dep. 272:17-273:5.) During depositions of Plaintiffs' bidders, however, it became clear that the bid sheets did not reflect *actual* bids but liens on which Plaintiffs *intended* to bid. Specifically, during their depositions Plaintiffs' bidders reviewed video footage from the 2007 tax lien sales which demonstrated that they did not bid on several liens that the bid sheets identified as liens on which they intended to bid. (*See* Meyers Dep. 303-339; Eastman-Fitak Dep. 92-113.) Indeed, Plaintiffs do not dispute that "[a]

videotape of a portion of the 2007 auction shows that Plaintiffs did not bid on all of the liens that their bid sheets identified as liens on which they intended to bid." (Dkt. No. 747 ("Pls.' Local R. 56.1(b)(3) Resp. DeLuca") ¶ 23.)

After these depositions, Plaintiffs revised their lists of their 0% penalty rate bids. In their October 27, 2009 "Third Supplemental Response to Heartwood 88, LLC's First Set of Interrogatories," which are attached to their Opposition as Exhibits 70 and 71, Plaintiffs identify several bates stamped documents ("the Superceding Lists") which "reflect [their] best efforts to reconstruct a list of those liens for which [they] submitted a 0% penalty rate bid based upon all the information available to [them]." (Pls.' Com. App. 70-71.) Plaintiffs have not provided either the Superceding Lists or the bid sheets to the court, and their failure to do so violates Federal Rule of Civil Procedure 56(e)(1): "If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit."

The court also notes that the October 27, 2009 supplemental interrogatory responses are not verified and are signed only by Plaintiffs' counsel. In those interrogatory responses, counsel does not identify whether he has personal knowledge of Plaintiffs' "best efforts to reconstruct" a list of the liens on which they bid 0%. Such personal knowledge, however, is a prerequisite to the court's consideration of interrogatory answers "in conjunction with a summary judgment motion." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1166 (7th Cir. 1996) ("Sworn interrogatory answers may be considered in conjunction with a summary judgment motion only if the person answering the interrogatory had personal knowledge or was competent to testify as to the matters stated."). Presumably Plaintiffs' counsel did not possess the requisite personal knowledge because only Plaintiffs' bidders would be competent to reconstruct the lists of liens on which they bid and to attest to whether they made their "best efforts" in creating those

19

lists.  The court, therefore, has not considered these supplemental interrogatory responses as evidence of the liens on which Plaintiffs bid the 0% penalty rate.

Operating without either the Superceding Lists or Plaintiffs' bid lists, the court has reviewed Plaintiffs' citations to various deposition transcripts and has been able to identify only one lien by name ("R&B Auto") and two liens by PIN numbers (16-13-403-007 and 16-31-404-027) on which Plaintiffs' bidder, Janet Meyers, believed she placed a 0% bid.  (*See* Defs.' Joint Ex. 1, Meyers Dep. 196:19-197:3; 198:3-17.)  Plaintiffs have not identified these liens anywhere in their Opposition, nor have they presented any evidence as to who ultimately was awarded these liens.  Viewing this evidence in the light most favorable to Plaintiffs and assuming that they did in fact bid the 0% penalty rate on these identified liens, the court still has no evidence from which it can reasonably infer that a Defendant, who was acting in violation of the SSBR, actually won one of these liens or that the auctioneers did not award those liens to the person they subjectively perceived as the first bidder.

> **D.**     **Evidence of the Liens that Plaintiffs Bid the 0% Penalty Rate and Lost to a Defendant Who Was Bidding in Violation of the SSBR**

Not only have Plaintiffs failed to identify the specific liens on which they bid the 0% penalty rate and lost, but they also have not specifically identified any liens that they contend they lost to a Defendant who was bidding in violation of the SSBR.  According to Plaintiffs, "they can establish that Defendants bid on the same liens as they did, [and that] members of the same enterprise bid on the same liens."  (Pls.' Opp. 38.)  However, neither their Opposition nor their Statement of Additional Facts specifically identify any of these liens.  Instead, in their Statement of Additional Facts, Plaintiffs generally assert that bidders acting on behalf of the respective three conspiracies bid simultaneously on the same liens numerous times during the tax

liens sales; Plaintiffs regularly bid 0% on liens during the tax lien sales for which bidders acting on behalf of Defendants also bid 0%; and many of the liens on which Plaintiffs and Defendants bid 0% were awarded to Defendants. (Case No. 07 C 1367, Dkt. No. 750 ("Pl.'s Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts") ¶¶ 51-53.) The court, however, agrees with Defendants that these statements are not supported by the cited evidence.

For example, Plaintiffs rely on three declarations from Plaintiffs' bidders, Andrew Marks, Janet Meyers, and Delores Eastman-Fitak, who assert with similar generality that bidders of the various enterprises bid simultaneously on and won liens on which Plaintiffs also bid. (Pls.' Com. App. 3-5.) During their depositions, however, these declarants conceded that they were unable to identify any specific liens that Plaintiffs bid on simultaneously with Defendants. (Defs.' Joint Ex. 4, A. Marks Dep. 573:16-574:2; *see also* A. Marks. Dep. 574:11-576:16; Defs.' Joint Ex. 1, Meyers Dep. 490:2-11; 492:9-22; Defs.' Joint Ex. 9, Eastman-Fitak Dep. 157:22-158:21.)

The video from the 2007 Cook County tax lien auction, which according to Plaintiffs, "confirm[s] that Plaintiffs can establish they lost liens to Defendants as a result of Defendants violating the [SSBR] to unlawfully participate in the Tax Sales" (Pls.' Opp. 28), is similarly insufficient to identify the liens Plaintiffs lost to Defendants bidding in violation of the SSBR. The video depicts only a few hours of one tax lien sale (*see* Pls.' Com. App. 35-36); this litigation, however, involves six separate annual tax lien auctions each spanning several weeks, with each day lasting up to eight hours inclusive of breaks. (Pls.' Local R. 56.1(b)(3) Resp. Sass ¶ 2.) Moreover, with respect to the video, Plaintiffs have not specifically identified (1) any individuals in the video; (2) the entities for which those individuals were bidding; (3) the liens on which they were bidding; (4) how they were bidding in violation of the SSBR; or (5) who

ultimately won the liens.

But even if Plaintiffs had presented such evidence, the video footage by itself does not establish which liens Plaintiffs would have won if Defendants were not participating in the County tax sales. As discussed above, the auctioneers were instructed to award the liens to the first bidder; when they were unable to do so, they were instructed to "choose one buyer at random, but be sure to spread the choices fairly so as not to favor any one buyer." (Pls.' Local R. 56.1(b)(3) Resp. Heartwood ¶ 39.) Without testimony from the auctioneers regarding how they awarded the liens depicted on the video, a jury would be forced to speculate as to whether the auctioneers were awarding liens to the person they perceived to be the first bidder or instead were attempting to "fairly" allocate the liens.[12] (Pls.' Local R. 56.1(b)(3) Resp. Heartwood ¶ 39.)

E.    Evidence of How Third-Party Bidders Bid at the Auction

Plaintiffs also have not presented evidence of the liens on which the third-party bidders were bidding at the auction. Although Plaintiffs do not dispute that each tax lien sale included multiple bidders who are not involved in this litigation,[13] Plaintiffs concede that they "have no records showing particular liens on which any buyer other than Plaintiffs and Defendants bid 0%

---

[12] As explained above, however, even when the auctioneer was attempting to "spread the choices fairly so as not to favor any one buyer" that method of awarding the liens, which relies on the subjective decisions of the auctioneer, did not ensure Plaintiffs won an equal allocation of liens.

[13] Specifically, it is undisputed that "[i]n addition to Plaintiffs and Defendants in this case, at least 60 other buyers were awarded one or more liens at the auction held in 2002; at least 117 other buyers were awarded one or more liens at the auction held in 2003; at least 104 other buyers were awarded one or more liens at the auction held in 2004; at least 167 other buyers were awarded one or more liens at the auction held in 2006; at least 76 other buyers were awarded one or more liens at the auction held in 2007." (Pls.' Local R. 56.1(b)(3) Resp. Heartwood ¶ 15.)

at any Cook County tax auctions between 2002 and 2007 other than video recordings produced by the Treasurer's Office and records indicating which liens were awarded to bidders." (*Id.* ¶ 59.) And as discussed above, Plaintiffs have not attempted to identify a single bidder in the video, including any third parties or the liens on which they were bidding. If these third-party bidders placed a lower bid on lien faster than Plaintiffs, and the auctioneer would have perceived that third party as the first bidder, Plaintiff would not be entitled to that lien regardless of Defendants' participation in the tax lien sales. Viewing the evidence in the light most favorable to Plaintiffs, the court finds Plaintiffs have not presented sufficient evidence from which a jury could reasonably identify a lien which was won by a Defendant violating the SSBR that Plaintiffs, as opposed to a third party that the auctioneer perceived was the first bidder, would have been awarded.

      F.      Evidence of the Value of the Hypothetical Bid Portfolio

Finally, the speculation surrounding the specific liens Plaintiffs contend they lost due to Defendants' violations of the SSBR further complicates an assessment of how Defendants' alleged violation ultimately impacted the value of Plaintiffs' lien portfolios. As Plaintiffs do not dispute, not all liens are profitable and most liens awarded at 0% at the annual auctions do not result in a deed being awarded to the lien holder. (*Id.* ¶¶ 9, 11.) In fact, in cases where the owner redeems the property, the winning bidder could actually lose money on the lien, if for example proceeds from the sale of a deed to the property are less than the costs of purchasing and servicing the lien. (*Id.* ¶¶ 12, 14.) The value of the individual liens, therefore, could vary significantly. Without identifying the specific liens Plaintiffs would have won in the absence of Defendants' participation in the County tax sales, determining how that participation impacted the value of Plaintiffs' lien portfolio would necessarily be fraught with speculation and

uncertainty.

G.     Summary of Proximate Cause Considerations

In *Anza*, the Supreme Court recognized that the plaintiff's injury was too attenuated from the defendant's purported RICO violation where the proximate cause assessment would require the court to calculate not only "the portion of [the defendant's] price drop attributable to the alleged pattern of racketeering activity" but also "the portion of [the plaintiff's] lost sales attributable to the relevant part of the price drop." *Anza*, 547 U.S. at 459. Similarly in this case, the jury would need to determine which liens Defendants won as a result of their alleged violations of the SSBR and then in turn calculate the impact those lost liens had on Plaintiffs' overall lien portfolio. Such an analysis would require the type of "complex assessment" the Supreme Court discouraged in *Anza*. *See id.* at 459. Indeed, any number of reasons wholly unrelated to Defendants' alleged violations of the SSBR could impact the value of Plaintiffs' lien portfolios: the Treasurer's determination of whether to bar Defendants from the sales, and if so for how long; the actions of third-party bidders, including how quickly they bid; the auctioneers' subjective awarding of liens; and the property owners' decision to redeem the property, among the other considerations discussed above.

Although Plaintiffs provide the declarations of two experts, Thomas Dunn and Scott Schaffer, who purport to be able to undertake such an analysis (*see* Pls.' Com. App. 1, 2), their asserted ability to perform the requisite calculations can neither overcome the tenuous causal link between Defendants' accused actions and Plaintiffs' injuries nor serve as a substitute for Plaintiffs' lack of evidence. Surely the plaintiffs in *Anza* could have offered expert testimony analyzing "the portion of [the defendant's] price drop attributable to the alleged pattern of racketeering activity" and then measuring "the portion of [the plaintiff's] lost sales attributable to

24

the relevant part of the price drop," *Anza*, 547 U.S. at 459, but the Supreme Court determined that delving into such "intricate, uncertain inquiries" was inappropriate in the RICO context, *id.* at 460.

A civil RICO violation is a serious offense that carries equally serious penalties: treble damages and attorneys fees. *See* 18 U.S.C. § 1964(c). Recognizing the gravity of the charge, the Supreme Court has required a direct, rather than simply foreseeable, relationship between the alleged RICO violation and the plaintiff's harm. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 274 (1992) ("Allowing suits by those injured only indirectly would open the door to 'massive and complex damages litigation[, which would] not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages suits.'" (quoting *Assoc. Gen. Contractors v. Carpenters,* 459 U.S. 519, 545 (1983))) (alternations in original); *Hemi Group, L.L.C. v. City of New York*, 130 S. Ct. 983, 994 (2010) (emphasizing that liability for RICO claims "comes with treble damages and attorney's fees attached" in deciding that plaintiff failed to allege proximate cause). The uncertainty inherent in the awarding of liens at the tax sales, coupled with Plaintiffs' failure to present evidence at nearly every level of the proximate cause inquiry, leads this court to conclude that Plaintiffs have failed to demonstrate a genuine issue of material fact to survive summary judgment. Here, as in *James Cape*, "a court could never be certain whether [Plaintiffs] would have won any of the [liens] that were the subject of the conspiracy 'for any number of reasons unconnected to the asserted pattern of fraud.'" *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 403 (7th Cir. 2006) (quoting *Anza*, 453 F.3d at 458). Consequently, for the reasons explained above, Defendants' motions for summary judgment on Plaintiffs' civil RICO claims are granted.

II.     Defendants' Motions for Summary Judgment on Plaintiffs' Tortious Interference with

Prospective Business Advantage Claims

Under Illinois law, the elements for a cause of action for tortious interference with prospective business advantage are (1) plaintiff's "reasonable expectation of entering into a valid business relationship"; (2) "the defendant's knowledge of the plaintiff's expectancy;" (3) "purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship"; and (4) "damages to the plaintiff resulting from such interference." *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 370 (Ill. 1998). As explained above, Plaintiffs have not identified any specific liens that they contend they lost to Defendants who were bidding in violation of the SSBR. Moreover, based on the volatility and unpredictability of the County tax liens sales, awarding each 0% bidder a pro rata share of liens based on the number of bidders was neither intended nor possible. The court, therefore, agrees with Defendants that even when viewing the evidence in Plaintiffs' favor, Plaintiffs cannot prove that they had an actual expectancy of winning a specific lien or that Defendants could have known of any such expectancy. Accordingly, Defendants' motions for summary judgment on Plaintiffs' tortious interference with prospective business advantage claims are also granted.

## CONCLUSION

For the reasons explained above and as previously stated in this court's August 24, 2010 orders, Defendants' motions for summary judgment (Case No. 05 C 4095, Dkt. No. 620; Case No. 07 C 1367, Dkt. Nos. 708, 713, 716, 722, 723, and 725) are granted. Judgment is entered in favor of Defendants on Plaintiffs' civil RICO claims and claims for tortious interference with prospective business advantage.

ENTER:

_James F. Holderman_
_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: September 1, 2010