**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PHOENIX BOND & INDEMNITY CO., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case Nos. 05 C 4095** |
| | ) | **and**    **07 C 1367** |
| **JOHN BRIDGE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case asserted claims against a number of defendants under the Racketeer Influenced and Corrupt Organizations Act (RICO) and for tortious interference with prospective advantage under state law. The claims involved an annual sale at which the Cook County Treasurer auctions liens for past due property taxes, a mechanism for collecting back taxes. Plaintiffs alleged that the defendants rigged the sale over a period of several years. The scheme is described in greater detail in the Court's previous decisions in this case.

In this decision, the Court addresses plaintiffs' petition for attorney's fees and expenses.

### Procedural history

**1.     The two cases and the appeals**

Plaintiffs filed their original federal suit (Case No. 05 C 4095) in 2005. Judge Holderman dismissed that suit in December 2005, but the Seventh Circuit overturned

the dismissal in February 2007. *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928 (7th Cir. 2007). The Supreme Court granted certiorari and affirmed in June 2008. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 629 (2008). Plaintiffs filed a second suit (Case No. 07 C 1367) in March 2007, shortly after the Seventh Circuit's ruling, in which they added new plaintiffs and new defendants. In September 2010, Judge Holderman granted summary judgment in favor of the defendants in both cases. The Seventh Circuit overturned that ruling in March 2011 and remanded the case. *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011). The cases were then reassigned to the undersigned judge's docket.

**2.    The trial and the jury's verdict**

The cases were jointly tried to a jury in October – November 2011. Plaintiffs settled with a significant number of defendants before and during trial. The cases proceeded to verdict against two groups of defendants, referred to at trial as the "Sass" defendants and the "Gray" defendants. These defendants were first added when the second lawsuit was filed in March 2007.

Plaintiffs' claims that were decided by the jury involved two separate RICO enterprises. The evidence, however, overlapped to a significant extent, and plaintiffs also pursued (with the Court's approval) a theory of damages that took into account the misconduct of all of the defendants.

The jury found for the plaintiffs on one or more RICO claims against all of the Sass defendants and many of the Gray defendants. Consistent with the terminology used at the trial, the Court will refer to the Gray defendants who were found liable as the BG defendants.

On the RICO claims, the jury awarded the plaintiffs (before trebling) a little over $2,100,000 in compensatory damages against the Sass defendants and a little over $667,000 against the BG defendants. The jury also awarded plaintiffs a total of $2,447,800 in punitive damages against various Sass and BG defendants on plaintiffs' state-law claims.

The jury found for defendant Bonnie Gray on all of plaintiffs' claims against her and failed to reach a verdict on plaintiffs' claims against defendants Wheeler-Dealer, Ltd. and Timothy Gray. Plaintiffs later dismissed their claims against Wheeler-Dealer and Timothy Gray. Atlantic Municipal Corp., another one of the BG defendants, filed for bankruptcy after judgment was entered. The present fee petition ruling does not apply to these defendants.

**3.    Entry of judgment**

In January 2012, following extensive briefing, the Court addressed the defendants' contentions that they were entitled to a setoff for the amounts plaintiffs had received from other defendants via settlement. The Court concluded that the BG defendants were not entitled to a setoff because plaintiffs had obtained nothing in settlement from any other defendants who were claimed to have been part of the Gray RICO enterprise. *See Phoenix Bond & Indem. Co. v. Bridge*, Nos. 05 C 4095 & 07 C 1367, 2012 WL 8706, at *1 (N.D. Ill. Jan. 2, 2012).

The Court concluded that the Sass defendants were entitled to a setoff, "to be applied against the total amount of money to which plaintiffs are entitled to recover from the Sass defendants on the RICO claim, namely, the total damages (including trebling) plus any award of attorney's fees and expenses." *Id.* at *2. Plaintiffs had obtained a

total of $7,075,000 in settlement from other members of the "Sabre" enterprise, in which the Sass defendants were claimed to have participated. The Court then determined that a little over forty-six percent of the settlement payments should be allocated to state-law punitive damages (and thus not subject to setoff) and that the remainder should be allocated to compensatory damages. *See Phoenix Bond & Indem. Co. v. Bridge*, Nos. 05 C 4095 & 07 C 1367, slip op. at 4-5 (N.D. Ill. Jan. 24, 2012).

On January 25, 2012, the Court directed the entry of judgment against the defendants whom the jury had found liable. Part of the judgment involved punitive damages on plaintiffs' state law claims, which are not at issue here. The judgment regarding the RICO award was as follows:

- Plaintiff Phoenix Bond against Sass defendants: trebled RICO damages of $2,625,000, less a setoff of $1,905,259.71, for a net of $719,740.29.

- Plaintiff BCS Services against Sass defendants: trebled RICO damages of $3,697,500, less a setoff of $1,905,259.71, for a net of $1,792,240.29.

- Plaintiff Phoenix Bond against BG defendants: trebled RICO damages of $913,875.

- Plaintiff BCS Services against BG defendants: trebled RICO damages of $1,089,000.

To put it another way, the total jury award against the Sass defendants, with RICO trebling, was $6,322,500. Due to the effect of the settlement-based setoff, this was reduced to a total of $2,511,980.58. The total jury award against the BG defendants, with RICO trebling, was $2,002,875.

**4.    Plaintiffs' fee petition**

Plaintiffs have now filed a petition under RICO for an award of attorney's fees and expenses.  As stated in their reply brief, they request a total of $11,843,042.80 in attorney's fees and $1,067,085.26 in expenses.  Plaintiffs represent that before filing the fee petition, they removed a little over $1,900,000 worth of attorney time that was actually put into the case, and in their reply brief they withdrew just under $38,000 more.

Plaintiffs have also filed a supplemental fee petition seeking an additional $287,323.50 in attorney's fees and $4,266.82 in expenses.  The supplemental fee petition concerns work done following entry of judgment, preparation of the fee petition and related materials, and work on matters relating to the bankruptcy filings of certain defendants.

## Discussion

The RICO statute provides that a prevailing plaintiff "shall recover . . . the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).  As a starting point, courts rely on the "lodestar" method of calculation:  the time reasonably expensed on the litigation multiplied by a reasonable hourly rate.  *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  The fee applicant bears the burden on these points.  *Id.* at 437.

The parties have filed an enormous volume of materials with the Court.  These include attorney time records, detailed and voluminous spreadsheets listing objections to time entries, a joint statement identifying disputed issues, position papers on those issues, and further briefs.  The Court notes that defendants have objected on one basis or another (or multiple bases) to virtually every time entry by plaintiffs' attorneys.

The Court has grouped defendants' objections into the following categories:

- "relatedness" issues concerning attorney work that defendants contend is unrelated or insufficiently related to the claims against them and thus not compensable;

- "recordkeeping" issues involving the sufficiency of plaintiffs' attorneys' description of their work;

- "reasonableness / excessiveness" issues involving the degree of plaintiffs' success, comparison with fees charged by defense counsel, and reasonableness of particular elements of plaintiffs' request;

- "apportionment" issues involving whether each group of defendants should be responsible for less than 100 percent of a fee award;

- "hourly rate" issues involving the rates claimed;

- "expense" issues involving expert fees and other elements of plaintiffs' request for reimbursement of expenses; and

- the supplemental fee petition.

The Court will address each of these categories in turn.

**1.      Relatedness issues**

The Court addresses the following arguments under the heading of relatedness. First, the Sass and BG defendants were not named in the federal litigation until the filing of the second federal case, in 2007.  They contend that they should not be held responsible for attorney's fees and expenses incurred before that time.  Second, defendants argue that they should not be held responsible for fees incurred in pursuing defendants in other RICO enterprises or other defendants in their same RICO

enterprises, including defendants found not liable or dropped from the case. Third, defendants take issue with particular components of the fee award, concerning work relating to a state court lawsuit; a lawyer disciplinary complaint filed against one of the plaintiffs; a dispute with a formerly named plaintiff; and negotiating settlements with other defendants.

"[W]here as is the case here, a plaintiff is entitled to fees arising from one claim, that plaintiff may also obtain fees for other successful claims arising from the same common nucleus of facts." *Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516, 525 (7th Cir. 1995) (citing *Hensley*, 461 U.S. at 435). There is no question that the plaintiffs' claims against all of the defendants – other defendants claimed to be in the same enterprises as the Sass and BG defendants, those claimed to be in different enterprises, and even those sued before the Sass and BG defendants – all arose from the same common nucleus of facts. All of the claims concerned the conduct of the annual tax lien sale and the rules and regulations surrounding the sale; all concerned the same or an overlapping period of years; and plaintiffs' theory of damages appropriately took into account the conduct and results of the sale as a whole. Just as importantly, all of the claims relied on a common legal theory and thus required consideration and litigation of numerous legal issues common to all of the defendants.[1]

With this background in mind, the Court turns to the defendants' objections.

*Period before Sass and BG defendants were named.* The 2005 lawsuit and the 2007 lawsuit were unquestionably interrelated, and they were consolidated for both

---

[1] It is neither necessary nor appropriate to attempt to disaggregate the time that plaintiffs' attorneys spent on the state-law tortious interference claims, on which attorney's fees are not recoverable. The overlap between those claims and the RICO claims was complete, or virtually so.

discovery and trial purposes. They involved what amounts to the same RICO claim. The Sass and BG defendants were not parties to the 2005 lawsuit and did not become defendants until plaintiffs filed the 2007 lawsuit, but that does not mean that plaintiffs' fees incurred in connection with the earlier lawsuit are non-recoverable. "[T]here is no blanket impediment to including time spent in another litigation in a fee award . . . ." *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 414, 420 (3d Cir. 1993). If the other litigation was "inextricably linked" to the present lawsuit, the fees and expenses spent in that litigation properly may be included in the fee award. *Id.*[2]

There is no question that this is so with regard to the 2005 case. The earlier case is inextricably linked to this one, for the reasons described above. The Court therefore overrules defendants' objection to the fees plaintiffs' claim from the period before the Sass and BG defendants were named as parties in this litigation.

*Time spent pursuing defendants in other RICO enterprises or other defendants in same RICO enterprises as Sass and BG defendants.* The Sass and BG defendants have offered no viable basis for excluding in their entirety fees that they contend plaintiffs incurred in pursuing other defendants in the present cases. Plaintiffs' claims against other defendants in the same RICO enterprises as the Sass or BG defendants were inextricably intertwined with their claims against those defendants. In particular, plaintiffs' RICO claims against the Sass and BG defendants required them to prove the existence and nature of the enterprises in whose conduct these defendants were claimed to have participated. In addition, their RICO conspiracy claims required them to

---

[2] Contrary to the BG defendants' argument, *Gulfstream III Associates* does not require proof that work product generated in the other litigation was used in the present litigation. The Third Circuit described that as *a* means by which a party could show an "inextricable link," not the *only* means. *See id.* at 420-21.

prove the existence and scope of the conspiracies involving these defendants.[3]  This

necessarily required them to discover and marshal, and eventually offer, evidence

concerning participants other than the defendants who went to trial.  As plaintiffs argue,

the fact that the defendants "chose to risk going to trial, and lost, does not mean that

they can now pretend as though they were not part of the . . . Enterprise or that Plaintiffs

did not have to spend time proving its existence and their participation in it."  Pls.'

Resps. to Defs.' Objs. to Pls.' Fee Pet. at 10-11.

There was also a very significant overlap between the claims against the Sass

and BG defendants and those against defendants in other RICO enterprises.  As

described earlier, plaintiffs had to discover and marshal evidence concerning the

conduct of the tax sale, the Treasurer's requirements, the materiality of the types of

false statements each defendant was claimed to have made, and the effect of a bidder's

false certifications on the sale – and these are just some of the common factual issues.

In addition, as referenced earlier, plaintiffs' theory of damages took into account, and

appropriately so, the conduct and results of the sale as a whole, including how and the

extent to which the participation of *all* allegedly ineligible bidders impacted plaintiffs.

Finally, the legal issues underlying the RICO claims involving the different enterprises

were unquestionably common across the case as a whole.

In short, the claims against the defendants in the various enterprises were largely

intertwined.  Largely, however, does not mean completely.  There was an appreciable

amount of evidence that was specific to each enterprise, or to defendants within that

---

[3] The Court also notes that the Sass defendants have already received a credit on their damage award for settlement payments that plaintiffs obtained from other defendants in the same RICO enterprise as the Sass defendants, on the ground that these were payments that compensated for the same injury.

enterprise, that was unrelated to and not intertwined with the claims against defendants in other enterprises. Indeed, the Court previously declined to set off against the jury's awards against the BG defendants settlement payments that plaintiffs received from defendants in separate enterprises, on the ground that these involved different injuries. The BG and Sass defendants should not be charged with fees that are attributable only to other enterprises and defendants in them and that did not overlap or intertwine with the claims against the BG and Sass defendants. *Cf. Barrow v. Falck*, 977 F.2d 1100, 1105 (7th Cir. 1992) ("If in the end the plaintiff wins a full recovery, the court awards the full cost of the legal work, excepting only time spent so single-mindedly on the unsuccessful theory that it was 'unrelated' to the successful one. So, too, with multiple factual claims.").

The Court will address this point further in the "apportionment" section of this decision.

*Defendants found not liable.* A defendant "should not 'be required to compensate a plaintiff for attorney hours devoted to the case against other defendants . . . who are found not to be liable.'" *Rode v. Dellarciprete*, 892 F.2d 1178, 1185 (3d Cir. 1990) (quoting *Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d 1208, 1214 (3d Cir. 1978)). On the other hand, "attorney hours fairly devoted to one defendant that also support the claims against other defendants are compensable." *Id.* (internal quotation marks omitted).

As indicated earlier, defendant Bonnie Gray was found not liable, and defendants Wheeler-Dealer, Ltd. and Timothy Gray were dismissed by plaintiffs after the jury could not reach a verdict regarding the claims against them. The Court is persuaded,

however, that any time that might be considered to have been devoted to those particular defendants also supported the claims against the BG defendants, who were alleged to be part of the same enterprise as these defendants. This is particularly so due to, as described earlier, the need to prove a RICO enterprise as well as the conspiracy-related elements of plaintiffs' RICO conspiracy claim. The Court overrules this particular objection by defendants.[4]

*Negotiation of settlements with other defendants.* In response to defendants' objection to time relating to negotiation of settlements with other defendants, plaintiffs represent that they have withdrawn entries representing (at their requested hourly rates) $17,281 in attorney time. *See* Pls.' Reply at 21. Plaintiffs were not required to withdraw this time. As they note in their reply, the time spent on these matters necessarily involved assessment of the merits of the claims and defenses, which is intertwined to a significant extent with their prosecution of the claims against the remaining defendants (including the Sass and BG defendants). The Court will nonetheless hold plaintiffs to their withdrawal. No further reductions in this regard are necessary, however.

S*tate court lawsuit.* When Judge Holderman dismissed the 2005 case in December 2005, he dismissed plaintiffs' RICO claims for failure to state a claim and dismissed their state claims for lack of federal jurisdiction given the dismissal of the federal claims. *See* Case No. 05 C 4095, dkt. entry 127 (Dec. 21, 2005). Though plaintiffs appealed the dismissal order, they refiled their state-law claims in state court, to hedge their bets in case the Seventh Circuit affirmed the dismissal of the federal claims. In the state court case, plaintiffs named as defendants two of the Sass

---

[4] The Sass defendants cannot properly be held responsible for fees attributable only to the non-liable Gray defendants. This point, however, is subsumed in the general apportionment that the Court will address later in this decision.

defendants, as well as several other parties, including members of the so-called "Peters Group." It does not appear that a great deal of activity took place in the state court.

After the Seventh Circuit reversed Judge Holderman's dismissal order and the 2005 case was remanded for further proceedings, plaintiffs dropped the state court case, because it was no longer necessary. And, as previously noted, they filed the second federal case, including the Sass defendants. They did not include the Peters defendants because they had settled with those defendants in the interim.

The factual background for state law tortious interference claims is the same as that for plaintiffs' RICO claims. But time spent on the state law claims exclusively is not compensable under RICO. For example, the time needed to prepare and file pleadings that asserted only state-law claims, or to respond to motions directed exclusively to those claims, is unrelated to the RICO claims and thus is not properly compensable. On the other hand, if discovery was initiated or conducted in the state court case, then the time devoted to that unquestionably would be compensable here due to the overlapping nature of the state and federal claims. Plaintiffs have made no effort to explain in their briefs that they did any work on the state court case overlapped in any way with the RICO claims. The Court concludes that none of the time devoted to the state court litigation is compensable under RICO's fee-shifting provision.

*Suit against former plaintiff Oak Park Investments.* While the dismissal of the 2005 case was on appeal, Oak Park Investments, Inc. was dismissed as a plaintiff. In March 2007, the law firm representing the plaintiffs sued Oak Park in state court to recover unpaid legal fees. Plaintiffs' fee petition in this case included at least one entry that appears to relate to the fee-collection lawsuit. The Court agrees that this time is not

properly compensable.  After the Sass defendants noted this in their response brief, plaintiffs reduced their fee request by the amount attributable to that entry, so it is no longer at issue.  *See* Pls.' Reply at 29.

*ARDC complaint against Phoenix Bond's principals.*  The Court also agrees with defendants that time plaintiffs' counsel spent dealing with an ARDC complaint that the BG defendants' attorney filed against the two principals of plaintiff Phoenix Bond who are lawyers is not compensable.  The complaint was based on testimony they had given during depositions in the present case in which they allegedly admitted making false statements on forms submitted to the Cook County Treasurer.

The ARDC complaint was related to – or at least arose from – the present litigation.  The purpose for which the BG defendants' lawyer made the complaint is a subject of dispute.  Plaintiffs refer to it as a "tactic," suggesting that the BG defendants were attempting to gain some advantage in the present litigation.  The BG defendants' attorney says that he made the report to comply with his obligations under the Rules of Professional Conduct.   The Court is unpersuaded that there is enough of a relationship between the ARDC complaint and the present litigation to make the time counsel spent working on it properly compensable in this case.  The Court therefore excludes this time from plaintiffs' request.

## 2.    Recordkeeping issues

Defendants object to a very significant proportion of the attorney time entries of plaintiffs' counsel on the ground that they are overly vague or insufficiently descriptive. "[W]hen a fee petition is vague or inadequately documented, a district court may either strike the problematic entries or (in recognition of the impracticalities of requiring courts

to do an item-by-item accounting) reduce the proposed fee by a reasonable percentage." *Harper v. City of Chicago Heights*, 223 F.3d 593, 605 (7th Cir. 2000). *See also Hensley*, 471 U.S. at 433 ("Where the documentation is inadequate, the district court may reduce the award accordingly.").

Defendants argue that if "no client in an arms-length relationship" would agree to pay an attorney's fees based on the nature of the attorney's records, a court should decline to award such fees. *Matter of Chi., Milw., St. Paul & Pacific R. Co.*, 840 F.3d 1308, 1318 n.7 (7th Cir. 1988). The problem for defendants, however, is that the plaintiffs, business entities headed by reasonably sophisticated business people, *did* pay the fees of the principal law firm representing them for a significant period of the litigation during which counsel represented them on an hourly fee-for-service basis. *See* Affid. of Stanford Marks ¶ 3. Phoenix Bond's principal considered the time entries sufficient. *Id.* ¶ 6. The entries by those lawyers for that period are among those that defendants attack as inadequate, and they are the equivalent of the others that defendants attack. This by itself is sufficient to warrant overruling defendants' objections.

That aside, the Court finds the entries made by counsel to be sufficient to allow a reasonable assessment of the overall amount of properly compensable time. Some of the entries are general to be sure, but they are not unduly vague under the circumstances. Defendants also complain about so-called "block billing" – single time entries that cover a number of activities or activities relating to more than one defendant – but there is no prohibition of this as a basis for properly compensable time. *See Farfaras v. Citizens Bank and Trust of Chi.*, 433 F.3d 558, 569 (7th Cir. 2006). In a

case this large and complex, in which attorneys are routinely performing multiple tasks on any given day, it is neither surprising nor inappropriate for them to aggregate their work into a single entry. *See Top Tobacco, L.P. v. N. Atl. Operating Co.*, No. 06 C 950, 2007 WL 2688452, at *4 (N.D. Ill. Sept. 6, 2007). Indeed, in the Court's experience, this sort of timekeeping is the norm in the marketplace.[5] The Court finds these entries appropriate and sufficient as a basis upon which to determine the overall compensable fees. The Court therefore overrules defendants' objections.

### 3. Reasonableness / excessiveness issues

*Start-up time for newly added attorneys.* Defendants are correct that when new attorneys were added to the plaintiffs' team, those attorneys required start-up time. But the addition of new counsel was, as plaintiffs argue, "not only inevitable but to be expected," Pls.' Reply in Support of Pet. at 14, given the length (six-plus years) and complexity of the litigation. The requested time is not in the least bit unreasonable.

*Multiple attorneys for particular tasks.* Defendants are also correct that multiple attorneys charged for particular tasks, including among other things deposition preparation and attendance, as well as court appearances. In simpler cases, it is often appropriate to preclude double-charging for activities of this type. This case, however, was anything but simple, and the Court is persuaded that these charges were reasonable given the complexity of the evidence and the interweaving of the claims against the various defendants. With regard to court appearances, the Court can

---

[5] For lawyers preparing for trial, for example, it is common and reasonable for them to record preparation time as just that – trial preparation – without further specificity. It would be entirely unreasonable to impose, at the risk of forfeiting a fee award, a standard that would require them to disaggregate such time into its components, for example, "reviewed document A," "reviewed document B," "developed strategy for cross-examining witness X." Trial preparation involves a variety of interrelated tasks that cannot be neatly subdivided for billing purposes. In the Court's experience, paying clients have no trouble understanding this.

personally attest that it was often (and perhaps typically) necessary for more than one attorney to address or at least consult upon the multifarious issues that arose, making attendance by multiple attorneys reasonable under the circumstances.

*Carter & Reiner's time.* The Court is likewise persuaded that the time charged by the law firm of Carter & Reiner, which the Sass defendants challenge, was reasonably expended. Defendants are correct that numerous attorneys, including a fair number of senior attorneys, charged significant time to the case, including attorneys with firms other than Reed Smith (formerly Sachnoff & Weaver), the principal law firm that handled the case for plaintiffs. That, however, is unsurprising given its length and the complexity of the factual and legal issues involved, and the Court sees nothing unreasonable about Carter & Reiner's time, even when considered in conjunction with time charged by lawyers from other law firms.

*"Clerical" work.* Defendants contend that plaintiffs have improperly requested compensation for clerical-type tasks conducted by attorneys. In response, plaintiffs identified and have withdrawn eight time entries. *See* Pls.' Reply in Support of Pet. at 17. As for the remaining entries identified by defendants, the Court has reviewed them in detail. The overwhelming majority cannot fairly be characterized as involving "clerical" work, as it is relatively apparent that they concerned tasks that involved some exercise of judgment. *See* Sass Defs.' Exs., Tabs marked "Objection 6" for each law firm. A very modest proportion of the entries include time for what might be considered file management, but given the complexity of the case, these entries are completely appropriate and reasonable. As plaintiffs argue, the "time spent managing the massive record developed by both sides throughout the nearly seven year life of the litigation

was reasonable and necessary" as a task performed by attorneys.  Pls.' Reply in Support of Pet. at 16-17.  And, by the same token, plaintiffs should not be limited to recovery for this time at a paralegal-type rate.  The Court can attest from experience that organizational activity by the lawyers involved, including the lead lawyers, is necessary in order to avoid having to spend extra time further down the road.  The time entries in this regard are anything but excessive.  No further reductions are required.

*Summer associates.*  It appears that defendants also object to time charged for "summer associates" – law students working at one or more of the firms involved – though the Court was unable to find in defendants' materials any separate breakdown of this time.  The Court has sufficient experience, both before appointment to the bench, with law students performing legal work to make some generalized judgments about this time.  As a general rule, law firms charge considerably less to clients for this time, but not enough less given the amount of time needed to bring the students up to speed and the inevitable wheel-spinning involved.  The Court will reduce the time attributable to these entries by one-third.

*Time allegedly relating to 2010-11 appeal.*  Finally, defendants contend that plaintiffs seek to charge $850,000 for the second appeal of the case in 2010-2011.  This is incorrect.  As plaintiffs point out, a good deal of the time spent during this period, and included in defendants' figure, was spent at the district court level dealing with motions for sanctions that defendants filed after they prevailed on appeal.  The Court has reviewed the time involved and finds that it was reasonable and not excessive given the stakes involved and the complexity of the matters at issue.

**4.      Apportionment issues**

Defendants argue that the fee request should be reduced based on plaintiffs' purportedly limited success.  The result, however, cannot seriously be characterized as representing limited success.  It is true that the jury awarded plaintiffs less than they sought, but the damages awarded were quite substantial.  Just as significantly, plaintiffs prevailed on liability against defendants who fought tooth-and-nail for every square inch of ground over a six-year period.  The Court overrules this objection.

The BG defendants note that the fees plaintiffs seek represents many multiples of the fees that the BG defendants' attorneys charged.  That is beside the point.  During the period of time that the undersigned judge presided over the case, it was relatively apparent that the BG defendants had left the laboring oar on common issues – which describes most of the case – to other defendants, including the Sass defendants.  The BG defendants' situation does not represent a fair comparison.

Finally, the Court returns to the issue of apportionment of fees based on the proposition that plaintiffs were pursuing multiple claims against multiple defendants.  The Court has already rejected the proposition that plaintiffs may not recover from the Sass and BG defendants fees that might have been attributable to other defendants in the same particular RICO enterprise.  The Court has also found that there was significant overlap involving the claims relating to different enterprises and thus has rejected defendants' contention that each defendant group should be charged with (at most) fees only within its own enterprise.

The Court has also found, however, that some portion of the fees claimed by plaintiffs involves non-overlapping elements of their claims against defendants in other

enterprises. This makes it appropriate to reduce the amount claimed. What is more difficult is determining the appropriate reduction. The difficulty is largely inherent in the fact that the claims against different enterprises were intertwined to a very significant extent. It also derives in part, however, from two additional factors. First, the volume of time entries involved would make an item-by-item reduction impractical irrespective of the nature of the time entries. Second, the fact that plaintiffs' attorneys did not, for the most part, draw these sorts of distinctions in their time records makes an item-by-item reduction impossible, or virtually so.

Given these factors, the Court believes it appropriate to make a percentage reduction to account for the non-overlapping aspects of claims against defendants in different enterprises from those involving the Sass and BG defendants. *Cf. Northeast Women's Center v. McMonagle*, 889 F.2d 466, 476 (3d Cir. 1989) ("In cases in which the plaintiff's successful and unsuccessful claims involve a common core of facts or related legal theories, or where much of counsel's time is dedicated to the litigation as a whole, it is often impossible to divide counsel's time on a precise claim-by-claim basis."); *Harper*, 223 F.3d at 604 (court may "reduce the proposed fee by a reasonable percentage" if documentation is inadequate to make a more precise reduction). Considering the case as a whole, as well as the significance of the common and intertwined legal issues and the common and intertwined factual issues, the Court finds that a twenty percent reduction is appropriate for each defendant group. In other words, the Court concludes that twenty percent of the overall reasonable fee is properly attributable to non-intertwined aspects of the claims against defendants in other enterprises. To be more specific, the Court will determine an overall reasonable fee

amount; the Sass defendants will be responsible for eighty percent of the overall amount; and the BG defendants will be responsible for eighty percent of the overall amount. The liability will be joint and several for sixty percent of the overall amount, but only several for the other twenty percent.[6]

## 5.     Hourly rate issues

Defendants object to the hourly rates charged by a number of plaintiffs' attorneys. A reasonable hourly rate is "one that is derived from the market rate for the services rendered." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir.2 011) (internal quotation marks omitted). If the attorney has an actual billing rate that he typically charges and obtains for comparable litigation, that is presumptively his market rate. *Id.*; *see also, e.g., Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 555 (7th Cir. 1999) Once an attorney has offered evidence establishing his market rate, the burden shifts to the opposing party to show why a lower rate should be awarded. *See, e.g., Batt v. Micro Warehouse, Inc.*, 241 F.3d 891, 894 (7th Cir. 2001).

Plaintiffs have established that the hourly rates they seek in their fee petition are consistent with the rates they actually charged to their clients during the period when they were billing by the hour and that their clients, reasonably sophisticated business people, actually paid. This is sufficient evidence that these rates are the market rates for their services and that they are reasonable. *See, e.g., Mathur v. Bd. of Trs. of S. Ill. Univ.*, 317 F.3d 738, 743-44 (7th Cir. 2003). For good measure, however, plaintiffs have offered other evidence that by itself justifies the reasonableness of their claimed rates, including an affidavit by their lead trial attorney and another from an experienced

---

[6] By way of example, if Court determined that the overall reasonable was $1,000,000, the Court would assess $800,000 against the Sass defendants and $800,000 against the BG defendants, with each group jointly and severally liable for $600,000 of the sum assessed.

Chicago trial attorney.

Defendants have offered no evidence that rebuts the presumption that the rates plaintiffs' counsel claim are the appropriate rates for a fee award. They note that some of the law firms representing the plaintiffs at various junctures charged lower rates than Reed Smith, which supplied the lead attorneys and the only trial attorneys. In addition, the BG defendants point out that their attorneys charged lower hourly rates. These facts, however, are neither dispositive nor significant, particularly in view of the fact that the rates sought by plaintiffs' counsel are comparable to those charged by attorneys for the Sass defendants, who like plaintiffs' attorneys are with a large multi-city law firm.

For these reasons, the Court approves plaintiffs' proposed hourly rates.

**6.     Costs**

**a.     Expert fees**

Defendants challenge the fees charged by plaintiffs' experts, Scott Shaffer (about $600,000) and Thomas Dunn (about $132,000). The fees billed are indeed quite large, but the experts analyzed a very large amount of data in order to derive their opinions and prepare for challenges by defendants both at deposition and at trial. Shaffer, in particular, put together a damages model that required an enormous amount of work.

Defendants offer for comparison purposes the relatively modest fees charged by their experts. The Court agrees with plaintiffs that the comparison is inapt: these experts did not propose alternative damages models and did not testify at trial, and thus their work is insufficiently similar to be comparable.

The testimony of plaintiffs' experts was reasonably necessary to prove their case. The Court overrules defendants' objections and finds that the experts' charges were

reasonable.

The expert fees will not be apportioned under the formula the Court established earlier. The entirety of the fees is appropriately attributable to all defendants given the intertwined nature of the issues.

**b.     Other costs**

The Court has reviewed the other costs sought by plaintiffs and finds them to be reasonable given the complexity and duration of the case and the volume of materials filed with the Court and produced by and to opposing counsel.

The BG defendants' statement of objections that was included in the parties' joint submission required by Local Rule 54.3 included a contention that plaintiffs had not provided backup for their claimed costs. *See* Jt. Stmt. at 23. In response, plaintiffs argued that because defendants "never requested the backup for costs and expenses claimed[,] [p]laintiffs can hardly be held responsible for failing to provide information that was not sought from them." *See* Jt. Stmt., Ex. A at 23. The BG defendants did not pursue this objection further in their brief in opposition to the fee petition, *see* dkt. entry 997, and the Court considers them to have abandoned the point.

The Court therefore overrules defendants' objections to plaintiffs' requested costs. This includes the charges by "Chicago Winter," a graphics firm that developed and prepared trial exhibits, charts, and enlargements, which the Court finds reasonable.

Of these other costs, the Chicago Winter fees will not be apportioned under the formula referenced earlier – because those fees were almost entirely focused on the trial – but the remaining costs will be apportioned subject to that formula.

**7.      Plaintiffs' supplemental fee petition**

In May 2012, after their fee petition was fully briefed, plaintiffs filed a supplement in which they sought an additional $287,323.50 in attorney's fees and $4,266.82 in expenses, broken down as follows:

|  | Hours | Fees | Costs |
|---|---|---|---|
| Post-judgment work regarding non-bankrupt defendants: | 172.40 | $97,040.50 | $1,883.63 |
| Work connected with fee petition: | 349.80 | $163,599.50 | $2,383.19 |
| Work regarding bankruptcy filings by certain defendants: | 51.95 | $26,683.50 | --- |

*Work on the fee petition and supplemental petition.*  Defendants note, correctly as far as the court can determine, that the approximately $164,000 claimed for fee petition-related work is in addition to $91,572 claimed in the original fee petition for this work, making the total about $255,000, representing about 616 hours of attorney time. Defendants argue this is excessive.

There is no question that work on the fee petition was legitimately time-consuming.  The petition covered over six years of attorney work.  More importantly, defendants objected to the overwhelming majority of the attorney time entries submitted by plaintiff – literally thousands of entries.  Local Rule 54.3, for better or for worse, imposes additional obligations on counsel prior to submitting a fee petition, which increases the amount of time reasonably and necessarily devoted to its preparation and briefing.

In addition, the material that the parties submitted in connection with the fee petition was unusually voluminous.  If piled in a single stack, it is well over a foot high,

and this does not really capture the volume, because a great deal of it consists of spreadsheets with abundant information packed into very small spaces. And most of this material consists of objections made *by defendants* and support for those objections. Defendants cannot on the one hand object to virtually every aspect of the time claimed by plaintiff and then urge the Court to deny significant compensation for dealing with those objections and justifying the relief sought in the petition.

All of that said, the Court is unpersuaded that over 600 hours of attorney time was reasonably necessary for this work. Some of the work in question (though not much of it) concerns items that plaintiffs should have caught on their own, including the Oak Park Associates matter and other mistakes. More generally, however, 616 hours of attorney time amounts to four lawyers billing eight hours per day for nineteen days each. The fee petition and associated disputes were highly complex, but they were not that complex. Because of the difficulty in sorting out exactly what time is reasonable from exactly what time is unreasonable, the Court believes it appropriate to make a percentage reduction of the total fees requested for preparing the fee petition (both those claimed in the original petition and those claimed in the supplemental petition), and reduces that aspect of the request by one-third. The associated expenses are reasonable and are approved in full.

*Post-judgment work regarding non-bankrupt defendants.* The Court overrules defendants' objections to the time plaintiffs seek for other "post-judgment" work. This includes time preparing for an arguing various points on which the Court ordered argument (including researching and submitting additional authorities), and work relating to citations to discover assets. Some of the descriptions are general, but not so

general as to render the time non-compensable. Plaintiffs have sufficiently shown that this time and the associated expenses were reasonably and necessarily expended.

*Work regarding bankruptcy filings by certain defendants*. Certain of the defendants in the Gray enterprise filed bankruptcy petitions following the judgment. The Court is unpersuaded that any of this time is properly charged to the defendants who remain in the case, and plaintiffs have not shown otherwise. These requested fees are disallowed.

### Conclusion

In addition to the points specifically addressed in this decision, the Court has considered all of the other objections by the defendants and has found them to lack merit. The Court grants plaintiffs' petition and supplemental petition for attorney's fees and costs as described in this decision. Some further calculation will be required based on the Court's rulings, and the Court would like to get this done promptly in view of the fact that the merits appeal in this case is already pending. For this reason, plaintiffs are directed to make a supplemental submission embodying the reductions referenced in this decision and separately quantifying each, by no later than December 12, 2012. Defendants are directed to file a *joint* response to plaintiffs' submission, by no later than December 18, 2012. No reply will be permitted. The case is set for a status hearing on December 20, 2012 at 9:30 a.m., at which time the Court expects to rule. These are all firm dates.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 7, 2012

25